UNITED STATES DISTRICT COURT
IN DISTRICT OF MASSACHUSETTS

RECEIPT # _____ N/A

AMOUNT $ _____ N/A

SUMMONS ISSUED _____ N

LOCAL RULE 4.1 _____

WAIVER FORM _____

MCF ISSUED _____

BY DPTY. CLK. _____ O 8 5

DATE _____ 7/2/02

2002 JUL -2 P 1: 12

U.S. DISTRICT COURT
DISTRICT OF MASS.

SECURITIES AND EXCHANGE COMMISSION,

       **Plaintiff,**

    v.

**JAY S. LAVESON**

       **Defendant.**

:
:
:
:
:
:
:
:
:
:
:
:
:
:

**CIVIL ACTION NO.**

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges that:

### SUMMARY

1.    This matter involves illegal insider trading by defendant Jay S. Laveson ("Laveson") in the common stock of IDX Systems Corporation, Inc. ("IDX"), Medical Manager Corporation, Inc. ("Medical Manager"), and Daou Systems, Inc. ("Daou"), while the defendant was in possession of material non-public information about these companies.

2.    From March 2 through March 4, 1999, defendant Laveson, while employed as a senior financial analyst at IDX's South Burlington, Vermont headquarters, sold 2,000 shares of IDX stock and shorted an additional 7,500 shares while in possession of material non-public information which indicated that IDX's first quarter earnings for the quarter ended March 31, 1999, would be lower than expected. On March 5, 1999, before the market opened, IDX announced that it expected lower sales for the first quarter, which would result in a loss of $0.22 to $0.28 per share, significantly lower than the $0.35 gain per share that Wall Street analysts had

previously expected. Following the announcement, IDX's common stock dropped 44% from $26 to $14.50 per share. Laveson's total profit and loss avoided from his sale and shorting of IDX stock was approximately $109,889.95.

3.     In September and October 1998, prior to his illegal trading in IDX securities, Laveson bought 1,500 shares of Medical Manager stock while in possession of information that IDX and Medical Manager were engaged in merger discussions. Laveson came into possession of this information when he was assigned by IDX to perform due diligence on the potential transaction with Medical Manager. On October 26, 1998, Laveson sold his 1,500 shares of Medical Manager stock upon learning that IDX could not afford to go through with the stock-for-stock merger due to a significant drop in the price of IDX's stock.

4.     Between October 1998 through January 1999, Laveson bought 3,950 shares of Daou's stock while in possession of information that IDX and Daou were engaged in merger discussions. Laveson came into possession of this information when he was assigned to perform due diligence on IDX's potential transaction with Daou. Prior to October 1998, Laveson had never purchased Daou stock. On February 4 and 5, 1999, Laveson sold the 3,950 shares of Daou stock that he had purchased during the period in which the merger negotiations occurred between IDX and Daou. On February 5, 1999, Laveson also shorted an additional 2,000 shares of Daou stock. Laveson sold and shorted the stock after learning from Daou's chief operating officer ("COO") that the company expected to have a revenue shortfall for the quarter ended December 31, 1998 and that, as a result, IDX would likely cancel its plans to acquire Daou. When Laveson sold and shorted the stock, Daou had not yet announced its revenue shortfall to the public.

2

Laveson's total profit and loss avoided from his sale of Daou stock was approximately

$18,634.31.

5.       By virtue of his involvement in the insider trading, defendant Laveson violated

Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section

10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule

10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.  Unless enjoined, Laveson is likely to commit such

violations in the future.  Accordingly, the Commission respectfully requests that the Court

permanently enjoin Laveson from future violations of these statutory provisions and rules, order

him to disgorge all ill-gotten gains (with pre-judgment interest), impose civil penalties, and order

such further relief as the Court deems appropriate.

## JURISDICTION

6.       This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C.

§§78u and 78aa].  Venue properly lies in this district because Laveson is employed in Bedford,

Massachusetts, and placed the trades at issue through National Financial Services Corporation, a

Massachusetts company with its principal place of business in Boston, Massachusetts.

7.       The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C.§§77t(b)] and Sections 21(d) and (e) and 21A of

the Exchange Act [15 U.S.C. §§78u(d) and (e), §78u-1(a)].

8.       In connection with the conduct alleged herein, Laveson directly and indirectly,

made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of

national securities exchanges, and/or of the means and instruments of transportation or

communication in interstate commerce.

## DEFENDANT AND RELEVANT ENTITIES

9.    **Defendant Laveson**, age 45, of Atkinson, New Hampshire, was a senior financial

analyst at IDX at all relevant times.

10.    **IDX** is a Vermont corporation with its principal place of business in South

Burlington, Vermont.  IDX manufactures and distributes information management systems to

hospitals and other healthcare entities.  IDX's stock is registered with the Commission under

Section 12(g) of the Exchange Act and its shares are traded on the NASDAQ national market

system.

11.    **Medical Manager** is a Delaware corporation with its principal place of business

in Elmwood Park, New Jersey.  In September 2000, it was acquired by WebMD Corporation.  At

all relevant times, Medical Manager's stock was registered with the Commission under Section

12(g) of the Exchange Act.

12.    **Daou** is a Delaware corporation with its principal place of business in San Diego,

California.  Daou's stock is registered with the Commission under Section 12(g) of the Exchange

Act and trades on the NASDAQ national market system.

13.    A short sale is a technique by which investors may benefit from an anticipated

decline in the price of a stock.  To effect a short sale, an investor places an order with a broker to

sell shares of stock that the investor does not own.  The broker, in turn, loans the investor stock

obtained from either the broker's own inventory or another market participant.  If the stock

declines, as anticipated, the investor then purchases the stock at the lower price and "covers" his

4

short sale by repaying the broker, thereby reaping a profit equal to the difference between the amount at which the broker purchased the shares and the lower amount the investor paid for the shares.

## FACTS

### A.    Laveson's IDX Trades

#### 1.    IDX Lowers 1999 First Quarter Earnings Estimates

14.    In mid-February 1999, IDX's chief financial officer ("CFO") received an internal report indicating that the company's revenues for the quarter ended March 31, 1999 would be significantly lower than projected due to unexpectedly soft revenues from sales and service contracts. Over the following two weeks, the CFO concluded that IDX would not achieve its expected revenue objectives for the quarter.

15.    On March 1, 1999, the CFO told IDX's board of directors that the company would not achieve its revenue objectives for the quarter ended March 31, 1999. The board directed IDX's management team to inform the public about the revenue shortfall as soon as the CFO determined the extent of the shortfall.

16.    On March 5, 1999, IDX issued a press release announcing that sales for the quarter ended March 31, 1999 would be considerably lower than expected and that it would incur losses of between $0.22 to $0.28 per share, rather than a gain in earnings of $0.35 per share, as had previously been announced to the public. After the press release was issued, IDX's stock price dropped to $14.50, down $11.50 from its closing price of $26 per share on the previous day.

**2.      Laveson Learns Material Non-Public**
**Information About IDX's Earnings Shortfall**

17.      On March 1, 1999 at 8:30 a.m., prior to the IDX board of directors' meeting

discussed above at ¶ 16, IDX's CFO sent an electronic mail message ("email") to Laveson and

other employees in IDX's finance department regarding the company's expected revenue

shortfall for the quarter ended March 31, 1999.  Among other things, the CFO's electronic mail

message stated:  "[t]here is a very high probability that [IDX is] going to redirect the Street on

earnings for the year, especially for this quarter."

18.      In addition, the CFO's March 1, 1999 email solicited information from his staff,

including Laveson, about additional write-offs and expenses that IDX might recognize on its

books during the current quarter and fiscal year.  In his email, the CFO asked Laveson to

calculate how IDX's reduced interest income expectations would affect the company's future

cash flows.

19.      At 10:30 a.m. on March 1, 1999, the IDX finance department employee sent

Laveson an email and electronic spreadsheet which contained projected cash flow data

concerning IDX's 1999 interest income.  Such information would assist Laveson in performing

the analysis requested by the CFO in the March 1, 1999 email.

**3.      Laveson Sells and Shorts IDX Stock Using Material**
**Non-Public Information to Avoid a Substantial Loss**
**and to Make a Profit.**

20.      On March 2, 1999, one day after receiving the March 1, 1999 email from the

CFO, Laveson sold his entire holdings of 2000 shares of IDX stock at $27 a share, generating

6

proceeds of approximately $53,958.25. Later that day, Laveson also sold short 5,000 shares of

IDX at $26.37 per share, generating proceeds of approximately $131,683.10.

21.   On March 3, 1999 and March 4, 1999, Laveson sold short a total of 2,500

additional shares of IDX at $26.25 per share, generating proceeds of approximately $65,429.80.

22.   At 5:15 a.m. on March 5, 1999, prior to the opening of the market, IDX issued a

press release announcing that the company's earnings for the quarter ended March 31, 1999

would not meet Wall Street analysts' earnings expectations because of an unanticipated deferral

of sales orders by IDX customers. Following the announcement, IDX stock price dropped to

$14.50 per share from its closing price of $26.00 on the previous day.

23.   On March 5, 1999, after IDX issued the press release discussing its earnings

shortfall, Laveson covered the 7,500 shares of IDX stock he had shorted the previous three days,

thereby realizing approximately $84,931.70 in profits. Laveson also avoided approximately

$24,958.25 in losses on the 2,000 shares of IDX stock he had sold long on March 2, 1999.

24.   Laveson sold IDX stock while in possession of material, nonpublic information

that the company's earnings for the quarter ended March 31, 1999 would be lower than

previously expected.

25.   By selling 2,000 shares of IDX stock and shorting 7,500 shares of IDX during the

three-day period in advance of the company's negative earnings announcement on March 5,

1999, the total of all profits and losses avoided by Laveson was approximately $109,889.95.

26.   Prior to IDX's public announcement on March 5, 1999, IDX's management

intended that information contained therein concerning the company's negative earnings news be

kept confidential. At all times relevant to this matter, Laveson was under a duty to IDX and its

shareholders not to use the material, non-public information that the company was experiencing a revenue shortfall for his personal gain.  The information that Laveson learned in advance of IDX's March 5, 1999 press release concerning the company's revenue shortfall for the quarter ended March 31, 1999 was material non-public information.  In addition, at all relevant times, Laveson was subject to and aware of IDX's written policy concerning personal securities transactions, which (i) forbade company employees from using for their personal benefit nonpublic information (other than in furtherance of a legitimate corporate purpose) that came into their possession by virtue of their employment with IDX, and (ii) defined as "material" information concerning the company's revenue or earnings.

### B.    Laveson's Medical Manager Trades

#### 1.    Merger Discussions Between IDX and Medical Manager and Laveson's Knowledge of the Status of Such Discussions

27.    In or near March 1998, IDX's chief executive officer ("CEO") contacted Medical Manager's president to explore the possibility of a merger between the two companies.

28.    Shortly thereafter, negotiations began between IDX and Medical Manager. Laveson was assigned  responsibility for analyzing the financial aspects of the transaction. Throughout the merger discussions, IDX's CEO regularly updated Laveson about the status of the negotiations through periodic meetings.

29.    At all relevant times, IDX assigned the code name "Project Monsoon" to the potential merger with Medical Manager for the purpose of maintaining the confidentiality of the information.  Laveson was aware of the code name for the Medical Manager project.

30.    On September 9, 1998, IDX and Medical Manager executed a non-disclosure agreement relating to the merger negotiations.

31.    From September 28, 1998 through October 2, 1998, IDX's CFO and Laveson together performed due diligence regarding the financial aspects of the potential transaction at Medical Manager's offices in Tampa, Florida.

32.    On September 28, 1998, IDX's stock price peaked at approximately $53.00 per share. The structure of the potential merger transaction involved a proposed exchange of IDX stock for Medical Manager stock. On October 23, 1998, IDX's stock price dropped below $37.00 per share. Because of the significant price decline, IDX management concluded that IDX could not afford to acquire Medical Manager. As a result, IDX and Medical Manager terminated the negotiations. The merger discussions between IDX and Medical Manager were never made public.

33.    During the week of October 19, 1998, IDX's CEO met with Laveson and other members of the acquisition team. In those discussions, IDX's CEO told his staff that the Medical Manager deal would not be consummated because of the decline in IDX's stock price. On or about October 23, 1998, IDX's CFO also told Laveson that the merger transaction between IDX and Medical Manager would not go forward.

## 2.    Laveson's Purchases and Sales of Medical Manager

34.    On September 2, 1998, Laveson bought 1,000 shares of Medical Manager stock at $15.375 per share.

35.    On October 5, 1998, one business day after completing his due diligence work at Medical Manager, Laveson bought an additional 500 shares at $20.75 per share.

9

36.    On Monday, October 26, 1998, one business day after IDX and Medical Manager's merger discussions collapsed, Laveson sold 1,500 shares of Medical Manager stock at $22.625 per share. By this sale, Laveson realized an actual profit of approximately $8,131.51.

37.    At all times relevant to this matter, Laveson was under a duty to IDX not to use the material, non-public information that the company was engaged in merger negotiations with Medical Manager for his personal gain. The information that Laveson learned during the course of the companies' negotiations about the likelihood of a merger between IDX and Medical Manager was material non-public information. In addition, at all relevant times, Laveson was subject to and aware of IDX's written policy concerning personal securities transactions, which (i) forbade company employees from using for their personal benefit nonpublic information (other than in furtherance of a legitimate corporate purpose) that came into their possession by virtue of their employment with IDX, and (ii) defined as "material" information concerning the company's merger and acquisition activities.

38.    At all times relevant to this matter, Laveson was also under a duty to Medical Manager not to use the material, non-public information that IDX was engaged in merger negotiations with Medical Manager for his personal gain. The information that Laveson learned during the course of his work at IDX about a possible merger between IDX and Medical Manager was material non-public information. In addition, at all relevant times, Laveson was subject to and aware of the confidentiality agreement executed by and between IDX and Medical Manager in connection with the companies' merger negotiations.

10

## C.   Laveson's Daou Trades

### 1.   Merger Discussions Between IDX and Daou

39.     During the summer of 1998, an IDX vice president responsible for the company's consulting division ("Consulting VP") began to examine potential acquisition candidates for the purpose of expanding IDX's consulting business.  In early October 1998, Laveson was assigned to assist the Consulting VP by performing financial analyses of potential merger candidates.

40.     By mid-October 1998, the Consulting VP, Laveson, and IDX's director of corporate development identified Daou as an acquisition target.  Shortly thereafter, IDX's CEO contacted Daou's CEO to explore the possibility of a merger between the companies.

41.     On November 12, 1998, IDX and Daou executed a non-disclosure agreement. During the following weeks, representatives of both companies met on several occasions to discuss the merger.

42.     Between January 18, 1999 and January 20, 1999, Laveson was one several IDX employees responsible for performing a due diligence review of Daou in San Diego, California. Prior to the due diligence review in California, on January 13, 1999, the Consulting VP prepared a list of critical issues to be examined by IDX's due diligence team.  The issues identified by the Consulting VP included ascertaining Daou's revenue and earnings performance for the quarter ended December 31, 1998 (which had not yet been reported) as well as Daou's financial projections for the 1999 fiscal year.  The Consulting VP assigned to Laveson the responsibility for reviewing and analyzing Daou's financial condition, including the information relating to Daou's 1998 fourth quarter earnings.

43.     On January 21, 1999, Daou's vice president of finance sent Laveson an email message which attached a spreadsheet containing current information regarding Daou's revenue forecast for 1999. Daou's revenue forecast was based, in part, upon the company's revenue expectations for the fourth quarter of 1998. In his electronic mail message, Daou's vice president of finance told Laveson that Daou was on track to achieve its revenue forecast for the 1999 fiscal year.

44.     On January 29, 1999, Daou's COO and other Daou executives met with IDX representatives in Burlington, Vermont to continue merger discussions. During those discussions, Laveson asked Daou's COO whether the company expected to achieve its forecasted revenue for the quarter ended December 31, 1998. In response, the COO told Laveson that Daou's revenues in October and November 1998 were lower than expected and, as a result, it would be "a stretch" for Daou to make up the shortfall in December 1998. At the time of this conversation, Daou had not yet calculated its revenue totals for December 1998.

45.     Upon returning to California, Daou's COO and others prepared a report containing Daou's unaudited financial results for the quarter ended December 31, 1998. The report was faxed to Laveson by Daou's COO on February 4, 1999. The report indicated that Daou's revenue and gross margin for the quarter ended December 31, 1998 would be significantly lower than previous, publicly-disseminated forecasts made by Daou.

46.     In early February 1999, as a result of Daou's revenue and earnings shortfall, IDX terminated the merger negotiations with Daou. At that time, the discussions between Daou and IDX were also terminated, in part, because IDX pursued merger negotiations with another

company. The existence of the merger discussions between Daou and IDX was never publicly disclosed.

### 2.   Daou Announces Revenue Shortfall for Quarter Ended December 31, 1998 and for the 1998 Fiscal Year

47.   On February 18, 1999, Daou's stock price closed at $6.00 per share. That afternoon, after the market closed, Daou issued a press release which reported the company's financial results for the quarter ended December 31, 1998 and for the 1998 fiscal year. The press release stated that as a result of lower-than-anticipated revenue and gross margins, Daou incurred net losses of $3 million for the fourth quarter of 1998 and net losses of $1.3 million for the 1998 fiscal year.

48.   On February 19, 1999, Daou's stock opened at $5.06, down $.94 from its closing price the previous day. By the close of trading, Daou's stock price rebounded to $6.00 per share after having traded as low as $4.375 during the trading session.

### 3.   Laveson's Trades in Daou

49.   Laveson traded in Daou stock based on his knowledge regarding the status of the company's merger negotiations with IDX. Laveson also traded in Daou stock based upon his knowledge that Daou's revenue and earnings for the quarter ended December 31, 1998 would fall short of Wall Street analysts' expectations.

50.   On October 29, 1998, within three weeks after Laveson helped identify Daou as an acquisition target for IDX, he bought 3,500 shares of Daou's stock at a price of $3.375. Prior to that date, Laveson had never purchased Daou stock. On January 21, 1999, the same day that Daou's vice president of finance sent Laveson the email message indicating that Daou's revenue

for fiscal 1999 was on track to meet its revenue and earnings projections, Laveson bought an additional 450 shares of Daou stock for $7.25 per share.

51.     On February 4, 1999, the day that Daou's COO faxed Laveson the report which confirmed the extent of Daou's revenue and earnings shortfall, Laveson sold all of his Daou stock for $9.00 per share.  The next day, February 5, 1999, Laveson sold short an additional 2,000 shares of Daou stock at a price of $9.25 per share.

52.     On February 19, 1999, one day after Daou announced a revenue shortfall for the quarter ended December 31, 1998 and the 1998 fiscal year, Laveson covered his short sales at an average of $5.75 per share, realizing approximately $6,864.45 in actual profits.

53.     Laveson avoided a loss of approximately $11,472.45 on the 3,950 shares of Daou stock that he had sold long on February 4, 1999.  The total of profits and losses avoided by Laveson on all of his Daou transactions was approximately $18,634.31.

54.     At all times relevant to this matter, Laveson was under a duty to IDX not to use the material, non-public information that (i) IDX was engaged in merger negotiations with Daou, and (ii) Daou expected a revenue shortfall for the quarter ended December 31, 1998 for his personal gain.  The information that Laveson learned during the course of the companies' negotiations about the likelihood of a merger between IDX and Daou and Daou's financial performance was material non-public information.  In addition, at all relevant times, Laveson was subject to and aware of IDX's written policy concerning securities transactions, which (i) forbade company employees from using for their personal benefit nonpublic information (other than in furtherance of a legitimate corporate purpose) that came into their possession by virtue of their employment with IDX, and (ii) defined as "material" information concerning the company's

14

merger and acquisition activities. At the inception of merger discussions between IDX and

Daou, IDX assigned the code name "Tide" to the potential transaction for the purpose of

maintaining the confidentiality of the information. Laveson was aware of the code name for the

Daou project.

55.     At all times relevant to this matter, Laveson was also under a duty to Daou not to

use the material, non-public information that IDX was engaged in merger negotiations with Daou

for his personal gain. At all relevant times, Laveson was subject to the confidentiality agreement

executed by and between IDX and Daou in connection with the companies' merger negotiations.

All information that Laveson learned during the course of the companies' negotiations about the

likelihood of a merger between IDX and Daou was material non-public information. The

information that Laveson learned concerning Daou's financial condition, resulting from his due

diligence activities during the merger negotiations, was likewise material non-public

information.

## FIRST CLAIM

### Defendant Laveson Violated Section 17(a) of the Securities Act

56.     Paragraphs 1 through 55 are realleged and incorporated by reference as if fully set

forth herein.

57.     On or about March 2 through March 5, 1999, Laveson, knowingly or recklessly,

in the offer and sale of securities, used means or instruments of transportation or communication

in interstate commerce, or used mails, directly or indirectly:  (1) to employ a device, scheme, or

artifice to defraud; (2) to make untrue statements of material fact or to omit to state material facts

necessary in order to make the statements made, in the light of the circumstances under which

15

they were made, not misleading; or (3) to engage in transactions, practices, or a courses of

business which operated or would operate as a fraud or deceit upon the purchasers of IDX

securities.

58.    Specifically, from March 2, 1999 through March 5, 1999, Laveson, while in

possession of information that he knew, or was reckless in not knowing was material and

nonpublic, used that information when he sold and shorted shares of IDX securities.

59.    By reason of the foregoing transactions, practices, and courses of business,

Laveson violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

### Defendant Laveson Violated Section 10(b) of the Exchange Act
### and Rule 10b-5 thereunder

60.    Paragraphs 1 through 55 are realleged and incorporated by reference as if fully set

forth herein.

61.    On or about March 2, 1999 through March 5, 1999, Laveson directly and

indirectly, knowingly or recklessly, used means or instrumentalities of interstate commerce, or of

the mails, or a national securities exchange facility:  (1) to employ a device, scheme, or artifice to

defraud; (2) to make untrue statements of material fact or to omit to state material facts necessary

in order to make the statements made, in the light of the circumstances under which they were

made, not misleading; or (3) to engage in acts, practices or a course of business which operated

or would operate as a fraud or deceit upon IDX, its shareholders and other persons in connection

with the sale and short sale of IDX securities.

62.     Specifically, from March 2, 1999 through March 5, 1999, Laveson, while in possession of information that he knew, or was reckless in not knowing was material and nonpublic, used that information when he sold and shorted shares of IDX securities.

63.     By reason of the foregoing acts, practices, and courses of business, Laveson violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

## THIRD CLAIM

### Defendant Laveson Violated Section 17(a) of the Securities Act

64.     Paragraphs 1 through 55 are realleged and incorporated by reference as if fully set forth herein.

65.     On or about October 26, 1998, Laveson, knowingly or recklessly, in the offer and sale of securities, used means or instruments of transportation or communication in interstate commerce, or used mails, directly or indirectly:  (1) to employ a device, scheme, or artifice to defraud; (2) to make untrue statements of material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) to engage in transactions, practices or a courses of business which operated or would operate as a fraud or deceit upon the purchaser of Medical Manager securities.

66.     Specifically, on October 26, 1998, Laveson, while in possession of information that he knew, or was reckless in not knowing was material and nonpublic, used that information when he sold shares of Medical Manager securities.

67.     By reason of the foregoing transactions, practices, and courses of business, Laveson violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM

### Defendant Laveson Violated Section 10(b) of the Exchange Act
### and Rule 10b-5 thereunder

68.    Paragraphs 1 through 55 are realleged and incorporated by reference as if fully set forth herein.

69.    On or about October 26, 1998, Laveson directly and indirectly, knowingly or recklessly, used means or instrumentalities of interstate commerce, or of the mails, or a national securities exchange facility:  (1) to employ a device, scheme, or artifice to defraud; (2) to make untrue statements of material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) to engage in acts, practices or a course of business which operates or would operate as a fraud or deceit upon Medical Manager, its shareholders and other persons in connection with the sale of Medical Manager securities.

70.    Specifically, on October 26, 1998, Laveson, while in possession of information that he knew, or was reckless in not knowing was material and nonpublic, used that information when he sold shares of Medical Manager securities.

71.    By reason of the foregoing acts, practices, and courses of business, Laveson violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

## FIFTH CLAIM

### Defendant Laveson Violated Section 17(a) of the Securities Act

72.    Paragraphs 1 through 55 are realleged and incorporated by reference as if fully set forth herein.

73.     On or about February 4, 1999 through February 19, 1999, Laveson, knowingly or recklessly, in the offer and sale of securities, used means or instruments of transportation or communication in interstate commerce, or used mails, directly and indirectly:  (1) to employ a device, scheme, or artifice to defraud; (2) to make untrue statements of material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) to engage in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of Daou securities.

74.     Specifically, on February 4, 1999, February 5, 1999, and February 19, 1999, Laveson, while in possession of information that he knew, or was reckless in not knowing was material and nonpublic, used that information when he sold and shorted shares of Daou securities.

75.     By reason of the foregoing transactions, practices, and courses of business, Laveson violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SIXTH CLAIM

### Defendant Laveson Violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

76.     Paragraphs 1 through 55 are realleged and incorporated by reference as if fully set forth herein.

77.     On or about October 29, 1998, through February 19, 1999, Laveson, knowingly or recklessly, directly or indirectly, used means or instrumentalities of interstate commerce, or of the mails, or a national securities exchange facility:  (1) to employ a device, scheme, or artifice to

19

defraud; (2) to make untrue statements of material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) to engage in acts, practices or a course of business which operates or would operate as a fraud or deceit upon Daou, its shareholders and other persons in connection with the purchase, sale and short sale of Daou securities.

78.    Specifically, on October 29, 1998, January 21, 1999, February 4, 1999, and February 5, 1999, and February 19, 1999, Laveson, while in possession of information that he knew, or was reckless in not knowing was material and nonpublic, used that information when he purchased, sold and shorted shares of Daou securities.

79.    By reason of the foregoing acts, practices, and courses of business, Laveson violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue a Final Judgment of Permanent Injunction permanently restraining and enjoining defendant Laveson, his agents, servants, employees, attorneys, successors and assigns, and each of them, and all persons in active concert or participation with them, and each of them who receive actual notice of the Final Judgment by personal service or otherwise from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R § 240.10b-5] thereunder.

## II.

Issue an Order requiring defendant Laveson to pay disgorgement in an amount equal to the profits and losses he avoided as a result of his illegal insider trading, plus pre-judgment interest thereon.

## III.

Issue an Order requiring defendant Laveson to pay civil money penalties under the Insider Trading Sanctions Act of 1984, codified at Section 21A of the Exchange Act, as amended [15 U.S.C. § 78u-1(a)], of up to three times the amount of his total profit and losses avoided as a result of his illegal trading in the securities of IDX and Daou, and under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in amounts to be determined by the Court for defendant Laveson's trades in the common stock of Medical Manager.

## IV.

Grant such other and further relief as this case may require and the Court deems appropriate.

Respectfully submitted,

JUAN MARCEL MARCELINO
District Administrator

Kate Poverman
Assistant District Administrator
Illinois Bar # 6194023

21

Gary T. Grassey
Branch Chief
BBO # 636687

Carlos Costa-Rodrigues
Senior Counsel
BBO # 555912

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
73 Tremont Street, Suite 600
Boston, Massachusetts 02108
(617) 424-5900 ext. 627 (Costa-Rodrigues)

Dated: July *2*, 2002